Henry J. MORGAN, Plaintiff,

v.

PRUDENTIAL GROUP, INC., Prudential Ventures Corp., Nathan M. Shippee, John T. Becker, Mortimer M. Caplin, Richard N. Funkhouser, Frederick M. Glass, Charles J. Kushell, Jr., Adolph Magidson, Winston S. McAdoo, Theodore C. Bartling, Bartling & Associates, Inc., Price Waterhouse & Co., Palmer, Serles & Baar, and Caplin & Drysdale, Defendants.

No. 75 Civ. 5245.

United States District Court,
S. D. New York.

Dec. 15, 1978.

On Clarification of Order Feb. 27, 1979.

Silverman & Harnes, and Arthur H. Schwartz, New York City, for plaintiff; Arthur H. Schwartz, Sidney B. Silverman, Martin H. Olesh, New York City, of counsel.

Blatt & Smithline, New York City, for defendants Prudential Ventures Corp., Prudential Funds, Inc., Nathan M. Shippee, John Becker, Mortimer M. Caplin, Richard N. Funkhouser, Frederick M. Glass, Charles Kushell, Jr., Adolph Magidson, Winston S. McAdoo.

Eisenstat & Gottesman, P. C., New York City, for defendants Theodore C. Bartling and Bartling and Associates; J. Michael Gottesman, Samuel M. Eisenstat, New York City, of counsel.

Curtis, Mallet-Prevost, Colt & Mosle, and Eldon Olson, New York City, Price Waterhouse & Co., for defendant Price Waterhouse & Co.; Peter Fleming, Jr., Robert D. Piliero, New York City, of counsel.

D'Amato & Lynch, New York City, for defendant Palmer, Serles & Baar; Robert E. Meshel, Jonathan M. Plasse, New York City, of counsel.

Milbank, Tweed, Hadley & McCloy, New York City, for defendants Caplin & Drysdale, and Mortimer M. Caplin; Adlai S. Hardin, Jr., Samuel H. Gillespie, New York City, of counsel.

LASKER, District Judge.

In May, 1972, Henry Morgan purchased a limited partnership interest in the Plaza One Development Fund, one of five limited partnerships (referred to collectively as the 1972 Programs) created by Prudential Funds, Inc. (now Prudential Group, Inc.), and offered and sold to the public by Prudential Ventures Corp., a registered broker-dealer wholly owned by Prudential Funds, Inc., in 1972. The partnerships were to engage in oil and gas development and production, and were promoted as "tax shelters" for persons with high income. In 1975, the limited partnerships were dissolved, and Henry Morgan lost 80% of his investment. In addition, the Internal Revenue Service disallowed the tax deductions that Morgan had claimed on account of his investment in the 1972 Programs.

Alleging violations of sections 10(b), 14(e), and 15(c)(1) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78n(e), 78o(c)(1) (1976), and Securities and Exchange Commission rules 10b–5 and 15c1–2, 17 C.F.R. §§ 240. 10b–5, .15c1–2 (1978), Morgan sues Prudential Group, Inc. and its principal officers and directors, and Prudential Ventures, Corp. (the Prudential Defendants), as principals, and Theodore Bartling, Bartling & Associates, Inc., Price Waterhouse & Co., Palmer, Serles & Baar, Caplin & Drysdale, and Mortimer Caplin (who is also sued as a director of Prudential Group, Inc.) as aiders and abettors. All of the defendants move to dismiss the complaint on the ground that it fails to state "the circumstances constituting fraud" with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure. In addition, Mortimer Caplin and his firm, Caplin & Drysdale, move for summary judgment dismissing the complaint against them, and for an award of costs and attorneys' fees as a sanction under Rule 11 of the Federal Rules of Civil Procedure.

Morgan's principal claim is that in unspecified "selling documents" disseminated to the public, the Prudential Defendants, aided and abetted by the other defendants, knowingly or recklessly misrepresented the potential tax benefits of investment in the 1972 Programs. According to Morgan, the selling documents represented that the 1972 Programs would engage in "back end leveraging," which they touted, rather than "front end leveraging," which they criticized. It was contemplated that the 1972 Programs would borrow funds on a nonrecourse basis from independent third parties and use them to prepay intangible drilling and development expenses. If the loans were secured by proven and developed oil

and gas reserves, and only if they were so secured, the limited partners could increase their basis in their investment by their pro rata share of the loans, and deduct the stepped up basis in the year in which the expenses were prepaid. This is back end leveraging. If the loans were secured by undeveloped properties (front end leveraging), the Internal Revenue Service would not consider them bona fide and would not allow the limited partners to step up their basis and so claim tax deductions greater than their actual investment in the 1972 Programs. Morgan alleges that despite these representations in the selling documents, the defendants knew that the 1972 Programs would not engage in back end leveraging.[1]

An earlier complaint in this litigation contained no allegations "that the Prudential Defendants knew or recklessly failed to discover that their promises were false at the time they made them." *Morgan v. Prudential Funds, Inc.,* 446 F.Supp. 628, 632 (S.D.N.Y.1978). Because "[t]he absence of a scienter allegation [in the earlier complaint] destroy[ed] the claim of principal fraud and so, undermine[d] a basis for the imposition of secondary, aiding-abetting liability," *id.,* (citation omitted), the earlier complaint was dismissed without prejudice to filing an amended complaint within sixty days, *id.* at 633. The present motions are addressed to the complaint filed by Morgan in response to that dismissal.

## I.

*Motion by All Defendants to Dismiss under Rule 9(b) of the Federal Rules of Civil Procedure*

Rule 9(b) of the Federal Rules of Civil Procedure requires that "[i]n all averments

---

1. The complaint states:

"6(A) The selling Documents stated that the 1972 Programs would borrow money on a nonrecourse basis from independent third parties. The loans would be secured by oil and gas reserves already proved and developed, would be bona fide, and would have the effect of increasing each class member's cost basis for tax purposes. Such borrowing is known as "back-end leveraging". Further, the proceeds of such loans would be used to prepay intangible drilling and development expenses and such expenses would be passed through as deductions to the class in the year in which such expenses were prepaid.

(B) The Selling Documents were critical of other drilling programs which represented to the public that certain lending transactions entered into by such programs could result in increased tax deductions for persons who participated in their programs. The criticized loan transactions involved situations in which the loans were collateralized by oil and gas reserves to be developed through subsequent drilling and exploration activities. Such borrowings are referred to as "front-end leveraging". The Selling Documents stated that loans secured by oil and gas reserves to be developed would not qualify as bona fide loans, would not increase the cost basis of each unit purchased, and would not permit the deduction of the proceeds of such loans if used to prepay expenses by the participants in the programs. Front-end leveraging transactions were described in the Selling Documents as the "wrong way". The Selling Documents represented that the 1972 Programs would obtain bona fide loans secured by oil and gas properties already devel-

oped ("back-end leveraging") and that the proceeds of such loans when applied to intangible drilling and development expenses would provide additional tax deductions for each class member. In the Selling Documents, it was claimed that such loans would provide additional deductions which in the past had amounted to nearly 200% of cash subscriptions. The Selling Documents represented that the 1972 Programs, under the control of the Prudential Defendants, had the ability and the capacity to effect such bona fide loans which they characterized as the "right way".

(C) Defendants knew that the proceeds raised from the sale of the limited partnership interests would not be invested in proven reserves which could serve as collateral for back-end leveraging. Accordingly, acting with intent to defraud or with reckless disregard for the truth, the defendants prepared or assisted in the preparation of the Selling Documents which falsely represented that the 1972 Programs would invest only in proven reserves. Thus, the representation that the 1972 Programs would engage in back-end leveraging was false and defendants knew such representation was false, as at the time the defendants made such representation they did not intend to engage in back-end leveraging.

(D) The representation that the 1972 Programs would engage in back-end leveraging and not in front-end leveraging constituted a binding commitment that only such form of leveraging would be used."

Complaint ¶ 6.

of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." By requiring a party charging another with fraud to flesh out the charge in the complaint, Rule 9(b) protects defendants from irresponsible allegations of wrongdoing, discourages the filing of complaints designed to find wrongs rather than to redress them, and guarantees that "defendants are given notice of the exact nature of the fraud claimed, sufficient to permit responsive measures." *Todd v. Oppenheimer & Co.,* 78 F.R.D. 415, 419 (S.D.N.Y.1978); *see Segal v. Gordon,* 467 F.2d 602, 607–08 (2d Cir. 1972); *Gross v. Diversified Mortgage Investors,* 431 F.Supp. 1080, 1087 (S.D.N.Y.1977); *Rich v. Touche Ross & Co.,* 68 F.R.D. 243, 245 (S.D.N.Y. 1975).

The defendants argue that Morgan's complaint fails to satisfy the requirements of Rule 9(b) in three ways: first, it does not specify the documents alleged to contain misrepresentations and fails to identify the statements alleged to be false; second, it does not state the basis for Morgan's belief regarding allegations pleaded on "information and belief"; and third, it does not detail the nature or scope of the assistance rendered the Prudential defendants by the aider and abettor defendants in the perpetration of the alleged fraud.

*A. Identification of False Statements*

■ The complaint describes in some detail the substance of the statements supposedly contained in the "selling documents," and the way in which those statements were false or misleading. In this regard, the complaint is adequate. However, neither the actual statements nor the documents purportedly containing them are identified, and "[t]he law does not excuse plaintiff's failure to identify the offending publications." *Denny v. Barber,* 73 F.R.D. 6, 9 (S.D.N.Y.1976), *aff'd,* 576 F.2d 465 (2d Cir. 1978); *accord, Gross v. Diversified Mortgage Investors,* 431 F.Supp. 1080, 1087 (S.D.N.Y.1977); *Rich v. Touche Ross & Co.,* 68 F.R.D. 243, 246 (S.D.N.Y.1975); *see Felton v. Walston & Co.,* 508 F.2d 577, 581 (2d Cir. 1974).[2] This, however, is the least of the complaint's deficiencies.

*B. Allegations Made on "Information and Belief"*

■ Morgan's entire complaint is alleged "on information and belief." The law permits a plaintiff charging fraud to plead in this manner only those matters peculiarly within the adverse party's knowledge. *Segal v. Gordon,* 467 F.2d 602, 608 (2d Cir. 1972); *Armstrong v. McAlpin,* [Current] Fed.Sec.L.Rep. (CCH) ¶ 96,323 at 93,078 (S.D.N.Y. January 26, 1978). It would be a wasteful exercise to detail here the allegations in the complaint relating to matters obviously not within the peculiar knowledge of the defendants (for instance, Morgan presumably has actual knowledge of the fact that "[p]laintiff is a limited partner in Plaza One Development Fund," and it seems unlikely that the characterization of the contents of the "selling documents" (quoted in note 1) is based on nothing more than information and belief), but the distinction between "information and belief" and "actual knowledge" is not a specious one, and it should be observed.

■ More importantly, allegations that are made on information and belief must be supported by a "statement of the facts upon which the belief is founded." *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 379 (2d Cir. 1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *accord, Segal v. Gordon,* 467 F.2d 602, 608 (2d Cir. 1972); *Armstrong v. McAlpin,* [Current] Fed.Sec.L.Rep. (CCH) ¶ 96,323 at 93,078 (S.D.N.Y. January 26, 1978); *Jacobsen v. Peat, Marwick, Mitchell & Co.,* 445 F.Supp. 518, 522 (S.D.N.Y.1977). Morgan's most significant failure to comply with this re-

---

**2.** What we have said applies with equal force to Morgan's claim that the selling documents falsely represented that Prudential Funds, Inc. "would make an immediate capital contribution to the 1972 Programs." Complaint ¶ 22.

To satisfy Rule 9(b), Morgan must identify the documents in which this representation was made, and the statements in those documents purported to make it.

quirement relates to the scienter allegations in the complaint.[3] Nowhere does the complaint state Morgan's information or otherwise indicate that there is any basis for his belief that the defendants knew or but for their reckless disregard for the truth would have known the things he charges them with knowing.[4] It is true that if these allegations were made on actual knowledge, they might satisfy the requirements of Rule 9(b), since "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b); *see Armstrong v. McAlpin,* [Current] Fed.Sec.L. Rep. (CCH) ¶ 96,323 at 93,097 (S.D.N.Y. January 26, 1978); *Raskas v. Supreme Equipment & Systems Corp.,* 71 F.R.D. 672, 674 (E.D.N.Y.1976). But insofar as they are made on information and belief they must be supported by a recitation of facts lending credence to the belief. Morgan need not demonstrate in his complaint that what he believes to be true is in fact true, but he must show that his belief is not without foundation, that it is belief rather than irresponsible speculation.

*C. Allegations of Aider & Abettor Participation*

■ The defendants' final objection to Morgan's complaint under Rule 9(b) is that it does not adequately detail the role of the aider and abettor defendants in the alleged fraud. Morgan must prove three elements to establish liability for securities fraud as

an aider and abettor: primary fraud by the principal, the aider's knowledge of or reckless disregard for the possibility of primary fraud, and the aider's substantial assistance of the primary fraud. *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 47–48 (2d Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); *Hirsch v. du Pont,* 553 F.2d 750, 759 (2d Cir. 1977); *Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 94–95 (5th Cir. 1975); *SEC v. Coffey,* 493 F.2d 1304, 1316 (6th Cir. 1974), *cert. denied,* 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975); *Landy v. Federal Deposit Insurance Corp.,* 486 F.2d 139, 162–63 (3d Cir. 1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974).

The complaint alleges that the aider and abettor defendants furthered the primary fraud in two ways. First, it is alleged that they participated in the preparation of the selling documents containing false statements at a time when they knew or but for their reckless disregard for the truth would have known that the representations made in those documents were false. Complaint ¶ 9. Second, it is alleged that subsequent to Morgan's investment in the Plaza One Development Fund, the aider and abettor defendants assisted the Prudential Defendants in implementing and concealing the primary fraud, and were aware that their activities were furthering a scheme to defraud investors. *Id.* ¶¶ 11, 13–21.[5]

---

3. *See, e. g.,* Complaint ¶ 6(C), *quoted in* note 1, *supra; id.* ¶ 9(A) ("Defendants Bartling and Bartling & Associates knew, or but for their reckless disregard for the truth should have known, that the properties were not producing properties but exploration properties which could not provide the collateral for the method of financing which, it was represented, would be followed"); *id.* ¶ 9(B) ("Defendant Price Waterhouse, knew, of but for its reckless disregard for the truth should have known that such prospectuses were false and misleading"); *id.* ¶ 9(C) ("Defendants [sic] Palmer, Serles knew, or but for its reckless disregard for the truth should have known, that such Selling Documents were false and misleading and that the method of operations represented in them would not and was not intended to be carried out"); *id.* ¶¶ 9(C), 9(D), 10.

4. This is true even if we consider the statements made in Morgan's attorney's affidavit submitted in answer to the motion for sanctions under Rule 11. See part III *infra.*

5. Briefly stated, that complaint alleges that the aider and abettor defendants assisted the Prudential Defendants in arranging "bogus loans" and disseminated false or misleading information to the limited partners in an effort to implement and conceal the scheme to defraud. We reiterate our reservation that "it is difficult to conceive of the events of December, 1972 and those that followed as 'in connection with' Morgan's purchase in May, 1972." *Morgan v. Prudential Funds, Inc.,* 446 F.2d 628, 633 (S.D. N.Y.1978) (citing *Halperin v. Edwards and Hanly,* 430 F.Supp. 121 (E.D.N.Y.1977); *In re Equity Funding of America Securities Litigation,* 416 F.Supp. 161, 171, 179–80 (C.D.Cal.

As noted above, the defendants correctly contend that insofar as Morgan's allegations regarding the aider and abettor defendants' knowledge or reckless disregard for the truth are made on information and belief, the complaint is insufficient because it fails to state the basis for Morgan's belief. The defendants also argue that with regard to the allegations that the aider and abettor defendants "participated" in the preparation of false or misleading selling documents the complaint is equally inadequate. As to most of the aider and abettor defendants, we agree.

Morgan must state each of the elements of aiding and abetting liability with particularity, including "substantial assistance of the primary fraud." An unadorned allegation that a defendant "participated" in the preparation of false and misleading selling documents is at most a conclusory allegation that it "substantially assisted" or "furthered" the fraud. Such conclusory allegations do not satisfy the strictures of Rule 9(b). The complaint must depict the acts purported to have furthered the fraud in sufficient relief to inform the defendants what it is that they are supposed to have done in furtherance of the fraud, so that they can frame a meaningful response. *See Weinberger v. Kendrick,* 451 F.Supp. 79, 82 (S.D.N.Y.1978).

Morgan alleges that "[d]efendants [Theodore] Bartling and Bartling & Associates participated in the drafting of the Selling Documents, in particular, with respect to the description and method of selection of oil and gas properties of partnerships sponsored by Prudential Defendants," Complaint ¶ 9(A), that "[d]efendant Price Waterhouse participated in the drafting, preparation and review of the prospectuses and, in particular, provided accounting and technical advice in connection with their preparation," *id.* ¶ 9(B), and that "[d]efendant Palmer, Serles participated in the drafting and preparation and review of the Selling Documents as general and SEC counsel to Prudential Defendants," *id.* ¶ 9(C). These allegations are inadequate because they do not state how the "participation" of these defendants assisted the Prudential Defendants in defrauding investors. For instance, it is not clear whether Morgan contends that Price Waterhouse acceded to the inclusion of false or misleading information in the financial portions of the prospectuses, for which it was directly responsible as the Prudential Defendants' accountant, or whether he contends that although the financials themselves were innocuous, Price Waterhouse furthered the fraud by not objecting to the inclusion of information it knew to be false or misleading in portions of the prospectuses for which it was not directly responsible. Absent a plain statement of how these defendants aided and abetted the Prudential Defendants, the complaint fails to satisfy Rule 9(b).[6]

1976); *Kogan v. National Bank of North America,* 402 F.Supp. 359 (E.D.N.Y.1975)).

6. Morgan's allegations regarding the roles of Caplin & Drysdale and Mortimer Caplin in furthering the primary fraud do satisfy the Rule. According to Morgan, Caplin & Drysdale furthered the primary fraud by allowing the Prudential Defendants to refer, in the selling documents, to the law firm's opinion that only back end leveraging would provide the tax benefits promised, even though it knew that back end leveraging would not be used, and thus that the tax benefits promised would not be realized. Complaint ¶¶ 9(D), 12. As to Mortimer Caplin, Morgan alleges:

"[D]efendant Caplin in March 1972, participated in a sales meeting to promote sales of limited partnership interests in the 1972 Programs and stated that the Prudential Defendants would be able to carry out its [sic] representations."

Complaint ¶ 9(D). Here, too, the activity alleged to have furthered the primary fraud is adequately depicted.

Of course, Morgan's allegations that Caplin & Drysdale and Mortimer Caplin knew that the 1972 Programs would not use back end leveraging, which are made on information and belief, suffer from the defect discussed above —they are not supported by facts suggesting the basis for Morgan's belief. In any event, the complaint must be dismissed against Mortimer Caplin and Caplin & Drysdale because the claim of primary fraud is inadequately pleaded, which leaves nothing to which claims of aiding and abetting liability can be appended.

### D. Morgan's Section 14(e) Claim

In addition to his claims under sections 10(b) and 15(c)(1) of the Securities Exchange Act, Morgan asserts a claim against the Prudential Defendants under section 14(e) of the Act, 15 U.S.C. § 78n(e) (1976), which makes it unlawful to make false or misleading statements or to engage in fraudulent activity "in connection with any tender offer or request or invitation for tenders." Since liability under section 14(e) is also predicated on fraudulent conduct, see *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 362 (2d Cir. 1973), the strictures of Rule 9(b) apply to Morgan's section 14(e) claim as well as to his section 10(b) claims. Although the parties have not specifically addressed the question whether Morgan's section 14(e) claim is stated with particularity, a cursory reading of the complaint demonstrates that it is not.

Indeed, it is not at all clear just what Morgan is complaining about in paragraphs 24–30 of his complaint. The best that we can make of the allegations is that Morgan believes that the Prudential Defendants acted wrongfully in connection with the liquidation of the 1972 Programs. If this is his concern, the appropriate remedy would appear to be an accounting under state law. Morgan states, however, that a tender offer disclosed that "the 1972 Programs had sold their assets and would redeem limited partnership interests for a present payment of $2,000 per $10,000 invested," but failed to disclose "material information" such as the terms of the sale of assets. The tender offer was revoked.

To prevail on a cause of action under section 14(e) Morgan must show that in connection with a tender offer someone acting with the requisite culpability made false or misleading statements, or engaged in fraudulent, deceptive, or manipulative acts or practices, and that Morgan was injured as a consequence. *See Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 362 (2d Cir. 1973). The complaint is inadequate under Rule 9(b) in three ways: it does not identify the author of the alleged tender offer, it does not allege scienter, and it does not suggest any causal link between the allegedly false and misleading statements in the tender offer and Morgan's loss. Absent these particulars required not only by Rule 9(b) but by the rules governing the content of a complaint in general, the complaint fails to state a claim under section 14(e).

For the reasons stated above, the complaint is again dismissed without prejudice. However, no further opportunity to replead will be granted. *See Denny v. Barber,* 576 F.2d 465, 470–71 (2d Cir. 1978).

## II.

### Motion of Caplin & Drysdale and Mortimer Caplin for Summary Judgment [7]

Although Morgan does not identify in the complaint the selling documents that he asserts contain false or misleading statements, he did identify at least some of them prior to the dismissal of his earlier complaint.[8] Mortimer Caplin and Caplin & Drysdale move for summary judgment on the ground that the documents so identified and upon which the claims against them are said to be based do not make the statements or representations that Morgan asserts they do.

A review of those documents reveals that with a single possible exception, none does make the statements that Morgan attributes to them. Morgan's essential assertions are that "[t]he Selling Documents stated that the 1972 Programs would borrow money on a nonrecourse basis from independent third parties," Complaint ¶ 6(A), and that "[t]he Selling Documents represented that the 1972 Programs . . . had the abili-

---

7. While the motions of Caplin & Drysdale and Mortimer Caplin could be ignored in light of the dismissal of the complaint under Rule 9(b), these defendants are entitled to a ruling on their motions and the protections such a ruling may afford them. .

8. Plaintiff's Answer to Defendants' Consolidated Interrogatory No. 18, Motion of Price Waterhouse & Co. to Dismiss the Second Amended and Supplemental Complaint, Exhibit E at 37.

ty and the capacity to effect such bona fide loans," *id.* ¶ 6(B). However, the prospectus dated October 8, 1971 (which must be considered a major selling document, *see* 15 U.S.C. §§ 77e(b)(1), 77j (1976)) clearly states the contingent nature of the Prudential Defendants' plan to use back end leveraging. For example, under the heading "Risk Factors—Speculative Nature," the prospectus states:

"The Partnership intends to leverage its funds to the maximum extent by borrowing on a non-recourse basis against its interests in previously developed properties resulting from development drilling on acquired prospects. There can, of course, be no assurance that the prospects acquired by the Partnership will prove capable of economic development, or that the Partnership will be able to borrow a substantial portion of its investment in any such previously developed properties. Although such leveraging activity is directed towards maximization for the benefit of the Limited Partners of the deduction for Intangible Drilling and Development Costs, there is also no assurance that such deductions will exceed the Commitments of the Limited Partners."[9]

Later, it states:

"If additional funds are at any time required to meet the obligations of the Partnership over and above the Commitments, the Company will attempt to obtain such funds through loans and other financing. In this connection, the Partnership contemplates borrowing funds for Partnership activities. The Partnership may borrow funds on a non-recourse basis from third parties, including banks and Operators, or from the Company and may pledge and mortgage Partnership Property and revenues attributable thereto. In non-recourse borrowing, the lender looks only to those Partnership assets used as security for the repayment of the Part-

nership obligation, and none of the Partners of the Partnership has any personal liability therefor. Any such borrowing by the Partnership will necessarily be affected by the availability of funds for such purpose. It should be noted that neither the Company nor any third party is obligated to lend such sums."[10]

In view of these and similar disclaimers in the prospectus, Morgan's position that it states that the 1972 Programs "would" engage in back end leveraging is simply untenable.

The other documents identified by Morgan *dehors* the pleadings include two letters from Prudential officials to officers of two investment banking firms,[11] a pamphlet,[12] and two memoranda from Prudential Ventures Corp. to securities dealers.[13] Although the two letters state that the *goal* of the 1972 Programs is "to achieve up to 200% of the subscription cost in tax write-off the first year," they refer to and enclose the prospectus. The pamphlet, entitled "Use of Leveraging in Gas and Oil Drilling: A Guide for the Professional Tax Advisor," contains a general discussion of the benefits and pitfalls of leveraging oil and gas investments, but does not discuss any particular program by name or implication, and concludes with the following legend:

"This bulletin is prepared for professional tax advisors and is presented as educational background material. It is general in treatment, conceptional in scope. Its reference to any specific situation is limited to its educational purpose."

The two dealer memoranda also contain a legend:

"NOT FOR USE WITH THE PUBLIC For dealer information only and may not be introduced or shown to members of the public or used orally or in written form as sales literature."

Only one of the two refers to the tax benefits of investment in a Prudential program

---

**9.** Motion of Caplin & Drysdale and Mortimer M. Caplin to Dismiss, for Summary Judgment and for Sanctions, Exhibit G at 3.

**10.** *Id.* at 7–8.

**11.** *Id.,* Exhibit K.

**12.** *Id.,* Exhibit H.

**13.** *Id.,* Exhibits L, M.

("a $10,000 investment in the 1972 Prudential Annual Drilling Fund will create a write-off . . . in excess of 100% and with a potential up to 150%"), but the program referred to is not one of the 1972 Programs.

The three remaining documents are sales literature.[14] Each contains a legend stating:

"This is submitted as general information only for programs administered by Prudential Funds, Inc. It is not authorized for distribution to prospective participants in any Fund unless preceded or accompanied by an effective Prospectus which includes information regarding the Fund's marketability of product, sales charges, and other information. This security is offered as a speculation only by Prospectus in those states where the law permits."

Two of the three are quite innocuous: they promote the 1972 Programs as tax shelters, but make no statements regarding the use of back end leveraging and do not detail the tax benefits expected.[15]

None of the documents discussed so far contain representations similar to those that Morgan alleges were made. Even if they did, there would be a substantial question whether reliance on such statements would be reasonable, in light of the caveats and disclaimers in the prospectus.

There remains a single document, entitled "Right Way—Wrong Way (There is a Right Way!)," which contains the following paragraph:

"There is no question regarding the attractiveness of tax leverage properly arranged. *The opportunity to properly employ tax leverage is offered by Prudential Drilling Funds* in both their balanced programs and in their Resource Ventures Development Programs [the 1972 Programs] all on a basis consistent with rules of the IRS." [16]

14. *Id.*, Exhibits J, N, O.

15. *Id.*, Exhibits J, O.

Depending upon the circumstances surrounding the dissemination of this document to the public, it might be viewed as representing that the 1972 Programs would employ back end leveraging. In view of the dismissal of the complaint, this question need not be further addressed here. We need decide only whether Caplin & Drysdale and Mortimer Caplin are entitled to summary judgment.

Morgan charges that Caplin & Drysdale aided and abetted the Prudential Defendants by allowing them to refer to tax opinions prepared by Caplin & Drysdale describing the benefits of back end leveraging, thereby endorsing or lending credence to the Prudential Defendants' representations that the 1972 Programs would realize those benefits.[17] Even assuming that in context the document quoted from above made a false representation, it does not in any way refer to or implicate Caplin & Drysdale. Indeed, of the documents discussed above, only the prospectus refers to the tax opinions of Caplin & Drysdale, and the prospectus makes no false representations. Consequently, Caplin & Drysdale is entitled to summary judgment dismissing the complaint against it barring the assertion of further claims against Caplin & Drysdale to the extent that those claims are predicated on alleged false or misleading statements in the documents discussed in this memorandum.

■ Morgan sues Mortimer Caplin in two capacities: as a director of Prudential Funds, Inc., and as an individual aider and abettor. As a director, Mortimer Caplin is not entitled to summary judgment with regard to the document entitled "Right Way—Wrong Way" because there are substantial questions of fact as to how it was used and the interpretation that it should reasonably be given. As an aider and abettor, Caplin may be even more directly connected to that document. Morgan charges that Caplin participated in a sales meeting for the 1972 Programs and declared that

16. *Id.*, Exhibit N (emphasis supplied).

17. Complaint ¶¶ 9(D), 12; *see* note 6, *supra.*

the Prudential Defendants would be able to secure back end leveraging for those Programs. Complaint ¶ 9(D). Caplin has submitted a "purported transcript" of his remarks at that meeting.[18] Taken in isolation, his remarks are innocuous. He discussed tax leveraging in oil and gas drilling funds, and stressed that only back end leveraging provides maximum tax benefits, but also stressed the hurdles to be overcome to achieve back end leveraging. However (as Morgan suggests in his brief, though not in the complaint), during his remarks Caplin apparently referred to the document entitled "Right Way—Wrong Way." Although it is difficult to imagine a scenario in which Caplin's remarks could reasonably be construed as endorsing the statement in that document that the "opportunity to properly employ tax leverage is offered by Prudential Drilling Funds," the question involved is one of fact. Accordingly, Mortimer Caplin is entitled to summary judgment dismissing the complaint and barring the assertion of further claims against him only to the extent that those claims are predicated on alleged false or misleading statements in the documents discussed in this memorandum other than the document entitled "Right Way—Wrong Way."

### III.

*Motion of Caplin & Drysdale and Mortimer Caplin for Sanctions Under Rule 11*

Rule 11 of the Federal Rules of Civil Procedure provides:

"The signature of an attorney constitutes a certificate by him that he has read the pleading; that to the best of his knowledge, information, and belief there is good ground to support it . . . . If a pleading is not signed or is signed with intent to defeat the purpose of this rule, it may be stricken as sham and false

. . . . For a wilful violation of this rule an attorney may be subjected to appropriate disciplinary action."

Rule 11 should not be taken lightly. As Judge Weinfeld recently remarked:

"Lawyers have a responsibility before subscribing their names to complaints which contain serious charges to ascertain that a reasonable basis exists for the allegations, even if they are made upon information and belief. This is one of the purposes of Rule 11 of the Federal Rules of Civil Procedure. Unverified hearsay based on rumor is not sufficient upon which to subject one to the burdens of complex litigation and heavy legal costs."

*Miller v. Schweickart*, 413 F.Supp. 1059, 1061–62 (S.D.N.Y.1976) (footnote omitted).

Morgan's original complaint was dismissed because Morgan failed to allege scienter. "Although it allege[d] that the representations in the selling documents ultimately proved to be false (the promised back end leveraging never materialized), it [was] not claimed that the Prudential Defendants knew or recklessly failed to discover that their promises were false at the time they made them." *Morgan v. Prudential Funds, Inc.*, 446 F.Supp. 628, 632 (S.D.N.Y.1978). Morgan's new complaint does not suffer from the same defect. However, Mortimer Caplin and his law firm charge that Morgan's new complaint is a sham, that in redrafting the complaint Morgan added allegations of scienter without "good grounds" for believing that they were true. Accordingly, they seek to recover their costs, including attorneys' fees, in connection with their present motion, as a sanction under Rule 11.[19]

There is no doubt that the allegations in Morgan's new complaint are difficult to reconcile with the prior sworn submissions of Morgan and his counsel.[20] By way of ex-

---

18. Motion of Caplin & Drysdale and Mortimer M. Caplin to Dismiss, for Summary Judgment and for Sanctions, Exhibit I.

19. In view of the need for further proceedings before this motion can be determined, we need not decide at this time whether an award of

costs and attorneys' fees is a permitted or appropriate sanction under Rule 11.

20. For instance, in answer to an interrogatory requesting the date of each defendant's actual knowledge that the selling documents contained false or misleading statements, Morgan stated: "The date of such actual knowledge for

planation, and in answer to the charge that new, inconsistent allegations were included in the new complaint because they were necessary to state a substantive claim of securities fraud, and not because Morgan or his attorney had any reason to believe them true, Morgan's counsel, Sidney Silverman, submitted an affidavit in which he states that "[t]he differences between the Second Amended Complaint and the earlier complaints resulted from my having acquired new relevant information and not from the need to comply with the technical requirements of pleading." [21] Silverman then recounts that following dismissal of the earlier complaint, he was contacted by two attorneys who represented or had represented the Prudential Defendants. They informed him of facts suggesting that the aider and abettor defendants knew at the time of the public offering of interests in the 1972 Programs that "properties which might be acquired by the 1972 Programs could not be timely developed so as to support non-recourse, back-end financing." [22] Silverman states that he sent these attorneys drafts of the new complaint, and that they informed him that to the best of their knowledge it was accurate.[23] In reply to Mr. Silverman's affidavit, counsel for Mortimer Caplin and Caplin and Drysdale submitted affidavits from the two attorneys referred to by Mr. Silverman. Their affidavits challenge the accuracy of Mr. Silverman's account of his conversations with them. In these circumstances, determination of the motion for sanctions under Rule 11 will require a hearing, which will be scheduled forthwith. Since the findings made at the hearing may limit the extent to which Morgan can allege scienter in any third complaint in this action, no such complaint should be filed until after the Rule 11 motion has been determined.

## IV.

The complaint is dismissed without prejudice to filing a third amended complaint within twenty days of the filing of an order on the motion of Caplin & Drysdale and Mortimer Caplin for sanctions under Rule 11. As noted, no further opportunity to replead will be granted.

The motion of Caplin & Drysdale for summary judgment dismissing the complaint is granted barring the assertion of further claims against it arising from statements contained in the documents discussed in this memorandum. The motion of Mortimer Caplin for summary judgment dismissing the complaint is granted to the extent of barring the assertion of further claims against him arising from statements contained in the documents discussed in this memorandum other than the document entitled "Right Way—Wrong Way (There is a Right Way!)."

An evidentiary hearing will be scheduled in connection with Caplin & Drysdale's and Mortimer Caplin's motion under Rule 11.

It is so ordered.

## ON CLARIFICATION OF ORDER

At the hearing on the motion of Mortimer Caplin and Caplin & Drysdale for sanctions under Rule 11, Fed. R. Civ. P., it was established that although Mr. Silverman may have misunderstood the two attorneys who contacted him following dismissal of

---

defendant Caplin & Drysdale is February 14, 1973." Plaintiff's Answer to Defendants' Consolidated Interrogatory No. 18, Motion of Price Waterhouse & Co. to Dismiss the Second Amended and Supplemental Complaint, Exhibit E, at 40. Yet the complaint alleges that as early as October, 1971, Caplin & Drysdale knew or should have known that the Prudential Defendants "would not engage in back-end leveraging and had no intention of so doing." Complaint ¶ 12.

21. Affidavit of Sidney B. Silverman at 1.

22. *Id.* at 2.

23. In addition, Silverman states that he learned from "a leading consultant to the oil and gas industry" that banks will only lend money against proved reserves, and that "it takes approximately two years to develop proved reserves from undeveloped property," *id.* at 3. Since the prospectus does not represent that the 1972 Programs would acquire only "undeveloped" properties, it is not clear what the relevance of this "new" information is supposed to be.

the earlier complaint, he acted at all times responsibly and in good faith. Accordingly, the motion was denied from the bench.

At the hearing, it also became clear that clarification of the ordering provisions of the court's December 15th memorandum decision might be appropriate, in order to avoid future confusion or complications. The complaint was predicated on the assertion that the selling documents represented unconditionally that the 1972 Programs would engage in back end leveraging. Since the selling documents make no such representation (with the possible exception discussed in the opinion above), summary judgment on this point was granted in full to Caplin & Drysdale, and in part to Mortimer Caplin. However, that disposition was not intended to bar a claim (which the court now understands the plaintiff to assert) that the defendants wilfully or recklessly represented in the selling documents that back end leveraging *might* be achieved, and the tax benefits of back end leveraging realized, in 1972, when in fact the defendants knew or should have known that it would be impossible to achieve back end leveraging in 1972.